**Case No. 20-12258-F**
**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

_____

**MARK BLACKBURN, et al.,**

**Plaintiff-Appellant**

**v.**

**SHIRE U.S., INC.; SHIRE, LLC,**

**Defendants-Appellees**

_____

**On Appeal from the United States District Court for the Northern District of Alabama, Southern Division**

**No. 2:16-CV-00936-RDP**

_____

**PLAINTIFF/APPELLANT MARK BLACKBURN'S REPLY BRIEF**

_____

Keith Jackson
Riley & Jackson, P.C.
3530 Independence Drive
Birmingham, AL 35209
Telephone: (205) 879-5000
kj@rileyjacksonlaw.com

Jonathan H. Waller
Waller Law Office, PC
2001 Park Place, Suite 900
Birmingham, AL 35203
Telephone: (205) 313-
jwaller@waller-law.com

i

## <u>CERTIFICATE OF INTERESTED PERSONS AND</u>
## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to F.R.A.P. 26.1 and 11th Circ.R. 26-1(3), the following is a complete list of all persons, firms, partnerships, corporations or entities that have an interest in the outcome of this appeal:

Mark Blackburn: Plaintiff/Appellant.

Melissa Blackburn:  Plaintiff/Appellant.

John R. Ipsaro:  Counsel for Defendants/Appellees.

Keith Jackson:  Counsel for Plaintiffs/Appellants.

Linda E. Maichl:  Counsel for Defendants/Appellees.

Jeffrey F. Peck:  Counsel for Defendants/Appellees.

Robert R. Riley, Jr.:  Counsel for Plaintiffs/Appellants.

Riley & Jackson, P.C.:  Law firm representing Plaintiffs/Appellants.

Shire LLC, merged into Takeda Pharmaceuticals U.S.A., Inc.: Defendant/Appellee.

Shire US Inc., merged into Takeda Pharmaceuticals U.S.A., Inc.: Defendant/Appellee.

Ulmer & Berne LLP:  Law firm representing Defendants/Appellees.

Jonathan H., Waller:  Counsel for Plaintiffs/Appellants.

Waller Law Office, P.C.:  Law firm representing Plaintiffs/Appellants.

Thomas E. Walker:  Counsel for Defendants/Appellees.

White Arnold & Dowd P.C.:  Law firm representing Defendants/Appellees.

Because Appellant is an individual, there are no subsidiaries, conglomerates, affiliates, parent corporations or any publicly held corporation that owns 10% or more of the stock issued by Plaintiff-Appellant, nor any other identifiable legal entities related to Parties.

Shire US Inc. and Shire LLC were merged into Takeda Pharmaceuticals U.S.A., Inc., which is a Delaware corporation with its principal place of business in Massachusetts. Takeda Pharmaceuticals U.S.A., Inc., is a subsidiary of Takeda Pharmaceutical Company Limited, which is a publicly traded company. No other publicly traded company directly or indirectly owns more than 10% of the shares of Takeda Pharmaceuticals U.S.A., Inc.

/s/Jonathan H. Waller
OF COUNSEL

# **TABLE OF CONTENTS**

I.   **REPLY TO APPELLEES' STATEMENT OF THE CASE AND FACTS** .1

  **A. Nature of the Case and Appellant's Allegations**..........................................1

  **B. The Product at Issue**.................................................................................3

  **C. Appellant and His Medical History** ........................................................5

  **D. Appellant's Prescribing Physician** .........................................................6

II.   **SUMMARY OF REPLY ARGUMENT** ................................................8

III.   **ARGUMENT** ......................................................................................11

  **A. There is Substantial Record Evidence That Lialda's Instruction For Use Was Inadequate.**...........................................................................................11

  **B. The Learned Intermediary Doctrine Does Not Bar Appellant's Claim.**.11

  **C. There is Substantial Evidence Establishing a Jury Issue as to Causation**. 12

  **D. Appellant's Claims Are Not Preempted.**..................................................15

    1.   The United States Supreme Court's "Impossibility" Standard. .................15

    2.   The CBE Regulation ...........................................................................16

    3.   Appellant's allegations of "newly acquired information" are fully sufficient. ...............................................................................................19

    4.   Proper Interval Testing Is a Label Safety Enhancement Contemplated by the CBE and Related Regulations. ..............................................................21

    5.   Appellees' "Highlights" argument has no merit. ......................................22

    6.   Appellees' Cited Cases Are Inapplicable..................................................25

  **E. The District Court Erred in Rejecting Appellant's Proposed Second Amended Complaint.**....................................................................................26

IV.   **CONCLUSION** ..................................................................................29

**CERTIFICATE OF COMPLIANCE** ..................................................................30

**CERTIFICATE OF SERVICE** ..........................................................................32

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Albright v. Teva Pharmaceuticals USA, Inc.,* 290 F.Supp.3d 1321, 1327–28 (S.D.Fla., 2017) ..............................................................................25

*Bank v. Pitt*, 928 F.2d 1108, 1112 (11th Cir. 2011)................................................27

*Bartlett*, 570 U.S. at 472 .........................................................................................26

*Baumgardner v. Wyeth Pharm.,* 2010 WL 3431671, at *2 (E.D. Pa.) ...................24

*Brazil v. Janssen Research and Dev., LLC,* 249 F.Supp.3d 1321, 1347-48 (N.D.Ga. 2016) ..............................................................................................25

*Brown v. Johnson & Johnson*, 64 F.Supp.3d 717, 720 (E D.Pa. 2014)................19

*Bryant v. Dupree*, 252 F.3d 1161, 1164 (11th Cir. 2001).......................................27

*Chambers v. Boehringer Ingelheim Pharmaceuticals, Inc.,* 2018 WL 849081 (M.D. Ga.) ..............................................................................................9

*Daniels v. Twin Oaks Nursing Home,* 692 F.2d 1321, 1325 (11th Cir. 1982) .........14

*Dorsett v. Sandoz, Inc.*, 699 F.Supp.2d 1142, 1158 (C.D.Cal. 2010).....................24

*Duncan v. Allergan, Inc.*, 2020 WL 6204563, at *6 (C.D.Cal. 2020)....................18

*Evans v. Gilead Sciences, Inc.,* 2020 WL 5189995, at *10–11 (D.Hawaii 2020)...20

*Geddes v. American Airlines, Inc.,* 321 F.3d 1349, 1352-53 (11th Cir. 2003).........16

*Higdon v. Tuson,* 746 Fed. Appx. 805, 815 (11th Cir. 2018) ..................................27

*Horrillo v. Cook, Inc.,* 2012 WL 6553611 at *5-6 (11th Cir.) .................................9

*Huskey v. Ethicon, Inc.,* 2015 WL 4944339, at *9 (S.D.Va. 2015)........................13

*In re Avandi Marketing, Sales and Products Liab. Litig.*, 945 F.3d 749, 758-59 (3d Cir. 2019)...........................................................................................18

*In re Rawson Food Serv., Inc.,* 846 F.2d 1343, 1349 (11th Cir. 1988) ...................16

*Kaiser v. Johnson*, 947 F.3d 996, 1010 (7th Cir. 2020)...........................................25

*Keck v. Dryvit Sys. Inc.*, 830 So.2d 1 (Ala. 2002) ..................................................2

*Kurns v. Railroad Friction Products Corp.,* 565 U.S. 625, 642 (2012)...................9

*Lavender v. Kurn,* 327 U.S. 645, 66 S.Ct. 740 (1946) ...........................................14

*Lavender*, 327 U.S. at 652-53 ................................................................................14

*Mason v. SmithKline Beecham Corp.*, 596 F.3d 387, 396 (7th Cir. 2010)..............24

*Mensing*, 564 U.S. at 626........................................................................................26

*Merck, Sharpe & Dohme Corp v. Albrecht*, 139 S.Ct. 1668, 1680 (2019) ..... passim

*Montalbano v. Ariad Pharm., Inc*., 2015 WL 11198245, at *8-9 (S.D.Fla.) ..........24

*Mutual Pharm. Co. v. Bartlett*, 133 S.Ct. 2466 (2013)..................................... 25, 26

*Nall v. C.R. Bard, Inc.,* 2018 WL 521791 (S.D.W.Va. 2018).................................13

*Nodd v. Integrated Airline Services, Inc.,* 41 F.Supp.3d 1355, 1368-69 (S.D.Ala. 2014)............................................................................................27

*Payne v. Novartis Pharmaceuticals Corp.*, 767 F.3d 526, 531-33 (6th Cir. 2014).13

*Penn. R. Co. v. Chamberlain*, 288 U.S. 333, 342-43 (1933) ....................................14
*PLIVA v. Mensing,* 564 U.S. 604, 611 (2011) ............................................................9
*PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011) .........................................................25
*Ralston Purina co. v. Hobson,* 554 F.2d 725, 728-30 (11th Cir. (Ala.) 1977) ........14
*Russell v. Ethicon, Inc.*, 2020 WL 4732106 (N.D. Ala.) ...........................................28
*Stone v. Smith, Kline and French Labs*, 447 So.2d 1301 (Ala. 1984) ....................28
*Taylor v. Novartis Pharmaceuticals Corp.*, 2013 WL 11310637 (S.D.Fla. 2013) .13
*U.S. v. Coulton*, 594 Fed.Appx. 563, 568-69 (11ᵗʰ Cir. 2014) .................................15
*Wagner v. Daewood Heavy Industrs. Amer. Corp.*, 314 F.3d 541 (11ᵗʰ Cir. 2002) 27
*Wendell v. SmithKline Beecham*, 2018 WL 6267855, at *7 (N.D. Cal. 2018) ........25
*White v. Cochran,* 2017 WL 6492004, at *2 (11ᵗʰ Cir. 2017) .................................27
*Wyeth v. Levine*, 555 U.S. 555 (2009) ........................................................... passim

**Statutes**
Alabama Code (1975) § 6-5-501 .................................................................................9

**Other Authorities**
FDA's February 2013 *Guidance for Industry: Labeling for Human Prescription
    Drug and Biological Products—Implementing the PLR Content and Format
    Requirements* .......................................................................................................23

**Regulations**
§ 201.57.............................................................................................................. 22, 23
§ 201.57(a) ...............................................................................................................23
*§314.70(c)(6)* ...........................................................................................................23
21 C.F.R. § 201.57(a)(1) ...........................................................................................23
21 C.F.R. § 201.57(a)(5) ...........................................................................................23
21 C.F.R. § 201.57(c) ................................................................................................21
21 C.F.R. § 314.70(c) ................................................................................................16
21 C.F.R. § 314.70(c)(6) ...........................................................................................17
21 C.F.R. § 314.70(c)(6)(iii)(A) ...................................................................... 17, 18, 20
21 C.F.R. § 314.70(c)(6)(iii)(A), (C) ..........................................................................21
21 C.F.R. 201.57(c)(6)(iii) ...........................................................................................2
21 C.F.R.. § 314.3(b) .................................................................................................19
73 Fed. Reg. 49609 (2008) .......................................................................................19
78 Fed. Reg. 67993 (Nov. 13, 2013)..........................................................................24
CBE regulation, § 314.70(c)(6) .................................................................................23

## TABLE OF RECORD REFERENCES

Initial Brief .............................................................. 2, 3, 4, 5, 6, 7, 10, 11, 12, 26, 28

Response Brief ................................................ 1, 4, 8, 9, 12, 16, 17, 20, 21, 25, 27

Declaration of Jonathan Winston, Doc. 210 ........................................ 3, 4, 5, 11, 20

Winston Report, Doc. 167-2 .....................................................................................3

Declaration of McEmber, Doc. 182 ........................................................................20

July 14, 2010 Email with SRD Attachments, Doc. 186-4 ............................... 3, 4, 5

Declaration of Benjamin England, Doc. 209 ...........................................................2

England Report, Doc. 209-1 ................................................................ 2, 3, 18, 20

6/1/20 Memorandum and Opinion, Doc. 244 ............................. 6, 7, 12, 14, 15, 29

First Amended Complaint, Doc. 41 ........................................................................1

2007 Lialda Label, Doc. 41-1 .................................................................................4

2013 Lialda Label, Doc. 41-2 ...........................................................................1, 4

5/8/17 Memorandum and Opinion, Doc. 53 ..........................................................12

Excerpt from 2005 NDA, Doc.182-2.......................................................................20

## I.    REPLY TO APPELLEES' STATEMENT OF THE CASE AND FACTS

### A.    Nature of the Case and Appellant's Allegations

Appellees' Statement is a misdirection from the material factual and legal issues which preclude summary judgment. (Response Brief, pp. 11-32).

Appellees had two independent duties, specifically, a duty to warn *and* a duty to provide instructions for safe use. The relevant section of the 2013 Lialda Label is Section 5: "Warnings and Precautions." (Doc. 41-2, p. 3). This section does warn about the side effect of renal impairment. Appellant has <u>never</u> claimed that Appellees failed to warn of this side effect.

Appellant always has asserted that the recommendation for evaluation of renal function "periodically while on therapy", in the second paragraph of Section 5.1, was unsafe and proximately caused Appellant's irreversible kidney injury. (Doc. 41, pp. 3-5, ¶¶ 17-24).

Appellant always has asserted that Appellees should have included a recommendation for "evaluation of renal function by simple serum (blood) tests of creatinine levels on a monthly basis for the first three (3) months after initiation of therapy and then on a quarterly basis for at least one year." (Doc. 41, pp. 5-6, ¶¶ 25-29). For convenient reference, Appellant referred to this testing protocol as "Proper Interval Testing" in his Complaint (*Id.*) Appellant used the synonymous term

"Specific Interval Testing" in his Initial Brief. See p.7.

Both the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"),[1] case law and applicable FDA regulation 21 C.F.R. §201.57(c)[2] (the "Safe Instruction Regulation") require a drug manufacturer not only to warn of side effects but also to provide appropriate instructions for safe use of a prescription drug.

European labels for 5-ASA drugs (including PENTASA, an identical mesalamine drug marketed by Appellees in the United States) include recommendations for testing at specific time intervals that are the same as, or substantially similar to, Appellant's proposed Proper Interval Testing. The OCTASA Label is identical to Proper Interval Testing, except that the first OCTASA test is after fourteen (14) days. (Appellant's Initial Brief, pp. 24-25) ("Initial Brief").

Extensive medical literature, including multiple post-2007 articles, supports Proper Interval Testing. England Declaration. (Docs. 209[3], 209-1, pp. 19-20, 25-26;

---

[1] AEMLD is a judicially created accommodation of Alabama law to the doctrine of strict liability for products. *Keck v. Dryvit Sys. Inc.*, 830 So.2d 1 (Ala. 2002).

[2] 21 C.F.R. §201.57(c)(6)(iii) expressly provides:

> "This section must identify any laboratory tests helpful in following the patient's response or in identifying possible adverse reactions. If appropriate, information must be provided on such factors as the range of normal and abnormal values expected in the particular situation *and the recommended frequency with which tests should be performed before, during, and after therapy*.

(emphasis added)."

[3] Doc. 209 is the Declaration which incorporates England's Report (Doc. 209-1).

¶¶ 41-43, 64-67; Winston Declaration, Doc. 210, pp. 23-24, ¶¶ 35-36).

Indeed, Appellees created a set of Standard Response Documents ("SRDs") which they sent to physicians who inquired about the meaning of "periodic" testing. The relevant SRD is titled "Effects of Mesalamine on the Kidneys," and specifically describes the recommendation for testing in the World article which is <u>identical</u> to Proper Interval Testing. (Initial Brief, pp. 26-27; Doc. 186-4, pp. 27-28[4]). This SRD discusses other articles (Gisbert, Corrigan and Stevens), and states that Gisbert "mentioned that many authors agreed on the monitoring recommendation suggested by World et al." If Dr. Ferrante had inquired about "periodic" testing, Appellees would have sent him this SRD. *Id.*

## B.    The Product at Issue

Appellant's nephrology and FDA experts discuss the foreign labels for 5-ASA drugs which call for testing of renal function at specific time intervals. (Winston Declaration[5], Doc. 210, pp. 23-25, ¶¶ 35-36); England Declaration, ¶¶ 49-53, pp. 21-22).

Dr. Winston explains why the "periodic" recommendation for renal monitoring was indefinite and undefined and, therefore, unsafe, and proximately

---

[4] Doc. 186-4 is a collection of SRDs regarding Lialda. This exhibit was filed under seal and does not have record page numbers.

[5] Dr. Winston's CV inadvertently was not attached to his Declaration. It appears in the record at Doc. 167-2.

caused Appellant's kidney injury. (*Id.* pp. 21-27, ¶¶ 32-43). Acute kidney injury is typically asymptomatic. (Initial Brief, p. 25). Proper Interval Testing is critical to detect acute kidney injury as early as possible to avoid chronic, irreversible interstitial nephritis resulting from extended exposure to 5-ASA therapy. (*Id.,* ¶¶ 30-31, pp. 20-21).

Dr. Winston opines that, if Appellant had lived in the United Kingdom, appropriate Proper Interval Testing would have detected his acute kidney injury and prevented his chronic and irreversible interstitial nephritis. (Initial Brief, p. 26, Doc. 210, p. 23-24, ¶¶ 35-36).

Appellees make several facially misleading claims regarding Lialda, including that "As initially approved, Lialda was limited to eight weeks of use." (Response Brief, p. 16). In fact, the 2007 label, "Indications and Usage," states that the safety and effectiveness of Lialda "beyond eight weeks has not been established." (Doc. 41-1, p. 5). This is <u>not</u> a limitation on the period for prescription. More importantly, the 2013 Indications and Usage section <u>says nothing</u> about eight weeks. (Doc. 41-2, p.2). Appellees' "eight-week" reference is facially inconsistent with a recommendation for "periodic" testing. In fact, Appellees prepared another SRD, titled "Long Term Safety and Efficacy of Lialda" which discusses "twelve months of Lialda treatment…". (Doc. 186-4, p. 5). Appellants also mention "off label" use. (Response Brief, p. 23). Appellees published another SRD titled "Use of

Lialda (Mesalamine) in patients with Crohn's disease." (Doc. 186-4, p. 4). Shire's own gastroenterology expert, Dr. Bloomfield, testified that it is appropriate for a physician to use his judgment to prescribe a drug for "off label" use. Dr. Ferrante and Dr. Janich testified that Dr. Ferrante complied with the applicable standard of care. (Initial Brief, p. 31).

### C.    Appellant and His Medical History

Appellees discuss Appellant's medical care before November 2013, his inflammatory bowel disease, his prior use of other medications, and his kidney disease in Sections C(1), C(2), C(3) and C(4) of the Response Brief. One apparent purpose is to suggest that prior medications may have caused Appellant's kidney injury or that Appellant would not have followed a recommendation for Proper Interval Testing. These disputed "observations" do not support Summary Judgment.

Dr. Winston utilized proper differential diagnosis methodology. (Doc. 210, pp. 3-7, ¶¶ 6-12). Dr. Winston opines that when Appellant last saw his primary care physician, Dr. Craig Young, in March 2012, Appellant did not have pre-existing chronic kidney disease. (*Id.* pp. 7-8, ¶¶ 13-14). Dr. Winston further opines that it is "very unlikely" that Appellant's kidney function deteriorated between March 2012 and November 2013. (Id. p. 8-9, ¶¶ 15-16).

Dr. Winston considered all of the non-prescription and prescription drugs that Appellant may have taken prior to November 2013. Dr. Winston ruled out all of

these medications as a potential cause of Appellant's interstitial nephritis. *Id*. pp. 10-12, ¶¶ 18-22; p. 28-30, ¶¶ 45-47. Appellant suffers from chronic and irreversible Lialda-induced kidney disease and is on the UAB transplant list (*Id.* p. 10, ¶18; p. 15, ¶25).

### D.    Appellant's Prescribing Physician

Appellant has described Dr. Ferrante's testimony in detail. (Initial Brief, pp. 27-30, 40-43, 46-47), including the testimony that he would have followed Proper Interval Testing. (Doc. 244, pp. 17-18).

The District Court held, as a matter of law, that because Dr. Ferrante did not evaluate renal function <u>prior</u> <u>to</u> prescribing Lialda in 2013, Dr. Ferrante's testimony that he would have followed that recommendation <u>after</u> <u>prescribing</u> is "speculation". (Doc. 244, pp. 16, 18).

Respectfully, the District Court ignored Dr. Ferrante's testimony about why he did not test renal function before prescription. The referring physician, Dr. Young, advised Dr. Ferrante that he, Dr. Young, had done a basic work up, including blood and stool tests "and everything checked out." (Initial Brief, p. 27).

Dr. Ferrante's practice was to rely on information from referring physicians about prior testing, including such blood work. Dr. Ferrante did not do pre-prescription blood testing of Appellant's renal function for this reason. (*Id.*, at pp. 27-28). Dr. Ferrante and Dr. Janich testified that Dr. Ferrante complied with the

applicable standard of care (a) when he relied on this information from Dr. Young and (b) when Dr. Ferrante refilled the prescription. (*Id.*, p. 30).

The District Court also held that Mr. Blackburn's failure to keep his January 2014 appointment with Dr. Ferrante "severs the causal chain". (Doc. 244, p. 20). However, Dr. Ferrante's testimony establishes that the purpose of the January 14th visit was <u>not</u> for the purpose of administering a serum creatinine blood test to detect possible acute kidney injury. (Initial Brief, pp. 28, 32). There is <u>no</u> <u>evidence</u> that the purpose of this appointment was to monitor Appellant's kidney function. *Id.* There was no reason for Dr. Ferrante to do blood work in January 2014 because he understood "periodic" to refer to at least "annual." *Id.*

The District Court's <u>factual</u> finding is also <u>contrary</u> to record evidence regarding Appellant's actual keeping of an appointment for the purpose of appropriate testing. Specifically, on March 9, 2012, Dr. Young noted that blood work indicated Appellant's PSA was "high normal". (Initial Brief, pp. 32-33). Dr. Young asked Appellant to return in six months for further PSA laboratory testing. Appellant fully complied with this recommendation and had PSA blood work (which was normal) on September 25, 2012. (Initial Brief, p.32). ***Thus, the only record evidence regarding whether Appellant actually complied with a physician's recommendation for future testing is that he did so***.

Moreover, Appellant testified that he was fully aware of the "periodic" recommendation and thought it referred to 12 or 18 months. Appellant believed that he took Lialda as recommended and that he followed the "periodic" procedure. (*Id*., p.31).

Indeed, as Appellees note, Appellant <u>stopped</u> taking Lialda in January or February 2015, which is squarely within his reasonable understanding of "periodic". (Response Brief, p. 24). Thus, there is no basis for a determination, as a matter of law, that Appellant failed to comply with the "periodic" recommendation.

The jury would fully be authorized to accept the inference that Appellant would have followed an instruction for Proper Interval Testing, just as he actually did for his PSA test, and that he thought he had done so regarding the "periodic" recommendation. *See* Section III(C), *infra*.

The testimony of Appellant and the Declarations of Dr. Ferrante and Dr. Winston establish the substantial likelihood that inclusion of Proper Interval Testing in the Lialda Label would have resulted in a different outcome for Appellant - - early detection of reversible acute kidney injury.

## II.    <u>SUMMARY OF REPLY ARGUMENT</u>

Appellees' misdirection includes their repeated characterization of Appellant's claim as a "warning" claim.  Appellees' Response Brief contains 20 references to "failure to warn" or "duty to warn." Appellees incorrectly assert that a

drug maker has no duty to provide instructions for safe use. (Response Brief, 32-33, 43).

Under AEMLD, a drug manufacturer must provide instructions for safe use. See Alabama Code (1975) § 6-5-501, which defines product liability action as including a claim for "personal injury…caused by the…warnings, *instructions,* marketing, packaging, or labeling of a manufactured product." (emphasis added).

This is completely consistent with the FDA Safe Instruction Regulation[6] and relevant case law. *See, e.g.*, *Horrillo v. Cook, Inc.,* 2012 WL 6553611 at *5-6 (11th Cir.) (reversing summary judgment as to failure to warn, "failure to instruct as to proper usage," and causation); *Chambers v. Boehringer Ingelheim Pharmaceuticals, Inc.,* 2018 WL 849081, *10, 14 (M.D. Ga.) (denying summary judgment based on evidence that drug label did not provide for adequate blood level monitoring).

Even Appellees' inapplicable generic drug Supreme Court case, *PLIVA v. Mensing,* 564 U.S. 604, 611 (2011), recognizes that "a manufacturer's duty to warn includes a duty to provide adequate instructions for safe use of a product"; s*ee also Kurns v. Railroad Friction Products Corp.,* 565 U.S. 625, 642 (2012)[7] (same as to non-drug manufacturer).

---

[6] See fn. 2.

[7] Appellants fail to cite any authority that a drug manufacturer has no duty to provide instructions for safe use.

Regarding learned intermediary and causation issues, Appellees simply ignore Dr. Ferrante's testimony summarized in the Initial Brief (pp. 27-32) and Section I, *supra*. Appellees also ignore the controlling authorities cited by Appellant. (Initial Brief, pp. 39-40, 43-44, 47-48). These include failure to warn cases which are directly applicable because the drug maker has a duty to both warn and give safe instructions.

Appellees re-assert a preemption defense which the District Court did not consider in granting summary judgment. Appellees conflate the Supreme Court decisions concerning brand name drugs with those concerning generic drugs. Controlling Supreme Court authority establishes an "impossibility" standard for a preemption defense asserted by a brand name drug maker. FDA regulations allow enhancement of a brand name drug label for safety purposes without prior FDA approval. Appellees never asked the FDA to "strengthen" the recommendation about monitoring renal function. There is no evidence that the FDA would have refused such a request. *See* Section III(D).

Finally, the District Court misapplied the Eleventh Circuit "one chance" standard regarding the right to amend after a trial court's first determination of deficiencies in a complaint, and erroneously held that Appellant's fraud and breach of warranty claims would be futile.

10

## III.    ARGUMENT

### A.    There is Substantial Record Evidence That Lialda's Instruction For Use Was Inadequate.

In his Initial Brief, pp. 38-39, Appellant relies on Dr. Winston's Declaration to establish that the "periodic" recommendation was unsafe. (Winston Declaration, Doc. 210, pp. 20-28, ¶¶ 30-44). This evidence is compelling. There is absolutely no basis for a <u>factual</u> finding, as a matter of law, that the "periodic" recommendation was safe and adequate. Appellees simply attempt to avoid this evidence by wrongly claiming that there is no duty to provide instructions for safe use.

Appellees also make the remarkable claim that "there is no evidence" that they "knew or should have known" that the Lialda Label should have included Proper Interval Testing. This completely ignores the Appellees' own SRDs and the "newly acquired information" discussed in Section III(D)(3).

### B.    The Learned Intermediary Doctrine Does Not Bar Appellant's Claim.

The Initial Brief demonstrates that the learned intermediary doctrine does not bar Appellant's claim. (Initial Brief, pp. 23-29). The Response Brief (Argument, Section B) merits only limited reply.  Appellees incorrectly claim that Appellant refers to only "snippets" from Dr. Ferrante's testimony.  See Initial Brief, pp. 27-30, 40-43, and 46-47.

Appellees re-assert that their duty is limited to warning of renal side effects and ignore the duty to give instructions for safe use. Then, Appellees erroneously claim that Appellant must show that, "but for the false representation, the prescribing physician would not have prescribed medication to his patient." (Response Brief, p. 44).

To the contrary, as Judge Proctor and Judge Haikala both recognized, citing multiple authorities, evidence that the prescribing physician would have still prescribed the drug but changed her behavior in a way resulting in a different outcome is fully sufficient. (Doc. 53, p. 16; Doc. 244, pp. 13-14); Initial Brief, pp. 39-40).

**C.     There is Substantial Evidence Establishing a Jury Issue as to Causation.**

The District Court erroneously rejected Dr. Ferrante's testimony that he would have followed Proper Interval Testing because he did not specifically read the Lialda Label before prescribing Lialda for Appellant. (Doc. 244, p. 18).

Respectfully, the District Court ignored Dr. Ferrante's testimony that he was fully familiar with the periodic recommendations for "periodic" testing because he had prescribed Lialda for years. (Initial Brief, p. 29-30 and fn. 10).

The District Court erroneously rejected Dr. Ferrante's testimony that he would have followed Proper Interval Testing on the basis that he did not evaluate renal function before prescribing Lialda. Dr. Ferrante and Appellant's gastroenterology

expert, Dr. Janich, have testified that Dr. Ferrante complied with standard of care by relying on the information from the referring physician, Dr. Young.

The District Court also erred in holding that Appellant's failure to keep his January 14, 2014 appointment broke the chain of causation. (*See*, *supra*, pp. 7-8).

None of Appellees' authorities support the proposition that a prescribing physician's testimony that the physician would have followed a modified label under these circumstances is somehow speculative. Testimony offered by a party or third-party witness typically will be "self-serving" or favorable to the offering party. Otherwise, why offer it? "Self-serving" deposition testimony may satisfy a party's evidentiary burden on summary judgment. *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010) (emphasis in original); *see also, e.g., Huskey v. Ethicon, Inc.,* 2015 WL 4944339, at *9 (S.D.Va. 2015) (despite the "conflicting" nature of plaintiff's physician's proximate cause testimony, plaintiff's claims were allowed to go to the jury,…").

Multiple applicable cases reject similar arguments that proximate cause testimony by prescribing physicians may be overlooked as "speculative" or "self-serving." *See*, e.g., *Payne v. Novartis Pharmaceuticals Corp.*, 767 F.3d 526, 531-33 (6th Cir. 2014); *Taylor v. Novartis Pharmaceuticals Corp.*, 2013 WL 11310637 at *6-7, at *6-7 (S.D.Fla. 2013); *Nall v. C.R. Bard, Inc., 2*018 WL 521791, at *3-4 (S.D.W.Va. 2018).

13

The District Court erroneously relied upon *Penn. R. Co. v. Chamberlain*, 288 U.S. 333, 342-43 (1933). (Doc. 244, p.18). *Chamberlain* addressed whether non-eyewitness testimony could overcome testimony by multiple eyewitnesses to create a question of fact for the jury. *Chamberlain* is clearly distinguishable, given Dr. Ferrante's testimony that he would have followed Proper Interval Testing. Moreover, *Chamberlain* has also been <u>modified</u> by *Lavender v. Kurn,* 327 U.S. 645, (1946). *Lavender* explained that evidence is speculative only when there is a "complete absence of probative facts". *Lavender*, 327 U.S. at 652-53.

Moreover, in *Daniels v. Twin Oaks Nursing Home,* 692 F.2d 1321, 1325 (11th Cir. 1982), this Court characterized *Chamberlain* as being "<u>superseded</u>" by *Lavender.* Thus, under *Daniels*, a verdict based on circumstantial evidence is not infirm because the evidence also supports an equally probable contrary inference. ("It is the jury that chooses among allowable inferences.") (*Id.* at 1326).[8]

The District Court also erroneously relied on *Ralston Purina co. v. Hobson,* 554 F.2d 725, 728-30 (11th Cir. (Ala.) 1977), which involved non-expert testimony by the plaintiff about what he believed caused the death of his chickens. This was speculative, given uncontroverted scientific expert testimony that the plaintiff's theory was impossible.

---

[8] Neither the District Court nor Appellees recognized that *Chamberlain* has been "superseded" in this Circuit by *Lavender*.

**D.    Appellant's Claims Are Not Preempted.**

The District Court did not address preemption in granting summary judgment. (Doc. 244).

This Court may affirm a district court's summary judgment ruling on any basis supported by the record. However, this Court is not required to address issues that the district court did not itself examine or address. *U.S. v. Coulton*, 594 Fed.Appx. 563, 568-69 (11th Cir. 2014). The preemption inquiry often involves consideration of complete factual issues. *Merck, Sharpe & Dohme Corp v. Albrecht*, 139 S.Ct. 1668, 1680 (2019) ("*Albrecht*"). Appellant respectfully submits that this Court should decline to analyze the voluminous record regarding preemption for the first time. That said, Appellees cannot meet their heavy burden of establishing this "demanding" affirmative defense.

1.    The United States Supreme Court's "Impossibility" Standard.

The Supreme Court has twice articulated the exacting standard for "impossibility preemption," sufficient to bar state law product liability claims against <u>brand</u> name prescription drug manufacturers. *Albrecht, supra, 139 S.Ct. at 1672*; *Wyeth v. Levine*, 555, 571 U.S. 555 (2009) ("*Wyeth*"). *Albrecht* and *Wyeth* are directly on point and preclude Appellees' preemption defense. Appellees, of course, have the burden of proving the "demanding" affirmative defense of

preemption. *Albrecht,* at 1678.[9]

Federal preemption bars state law claims only when it is "***impossible*** for a private party to comply with both state and federal requirements." *Albrecht,* at 1672 (emphasis added); *Wyeth*, 555 at 571 ("[A]bsent clear evidence that the FDA would not have approved a change to Phenergan's label, we will not conclude that it was ***impossible*** for Wyeth to comply with both federal and state requirements.") (emphasis added). Establishing such "impossibility" is a daunting task, as "the possibility of impossibility is not enough." *Albrecht,* at 1678.[10]

Appellees did not need to ask for, or obtain, prior approval to make a label change. Appellees never submitted such a label change. Appellees ignore the FDA regulations which permit a label change without prior FDA approval. Further, Appellees have not produced any evidence, much less the required clear evidence, that the FDA would have disapproved such a label change.

### 2. The CBE Regulation

Appellees' cannot meet the "impossibility" standard because of the FDA's "Changes Being Effected" 21 C.F.R. § 314.70(c) regulation. (the "CBE regulation").

---

[9]Appellees' preemption defense is based on "ordinary" or "defensive" preemption, which provides a substantive defense to state law claims. *See, e.g., Geddes v. American Airlines, Inc.,* 321 F.3d 1349, 1352 (11th Cir. 2003); *In re Rawson Food Serv., Inc.,* 846 F.2d 1343, 1349 (11th Cir. 1988). ("[T]he party asserting an affirmative defense usually has the burden of proving it.").

[10] Appellees urge a gauzy "independence" standard, rather than the clear and high "impossibility" bar articulated by the Supreme Court in *Albrecht* and *Wyeth*. [Response Brief; pp. 53-59].

16

The CBE regulation expressly allows brand name prescription drug manufacturers to strengthen their labels in response to "newly acquired information" without prior FDA approval. *Id.; Wyeth*, at 568; *Albrecht*, at 1673.

> As the *Albrecht* court plainly explained:
>
> Drug manufacturers generally seek advance permission from the FDA to make substantive changes to their drug labels. However, an FDA regulation called the "changes being effected" or "CBE" regulation permits drug manufacturers to change a label without prior FDA approval if the change is designed to "add or strengthen a ...warning" where there is "newly acquired information" about the "evidence of a causal association" between the drug and a risk of harm. 21 CFR §314.70(c)(6)(iii)(A).

*Albrecht,* at 1673.[11]

Ignoring the CBE regulation, Appellees erroneously argue that "[t]he FDCA does not permit changes to an approved drug labeling without prior FDA approval", and further contends that "any change to an approved application must be approved by the FDA prior to implementation". (Response Brief, p.52).

To the contrary, the CBE regulation expressly provides that a brand name drug manufacturer may make changes to its product label "to reflect newly acquired information" and distribute the product with those changes *prior to approval by the FDA* of the manufacturer's "CBE" supplement. 21 C.F.R. § 314.70(c)(6); *see also*

---

[11] "[A] drug manufacturer **will not ordinarily be able to show** that there is an actual conflict between state and federal law such that it was impossible to comply with both." *Albrecht,* at 1679 (emphasis supplied) (citing the CBE regulation).

*Albrecht,* at 1679 (CBE regulation permits a brand name drug manufacturer to file a supplemental application and then immediately "change a label to 'reflect newly acquired information' if the changes 'add or strengthen a… warning'…***without prior approval by the FDA***.") (emphasis supplied), quoting 21 C.F.R. § 314.70(c)(6)(iii)(A); *Wyeth,* at 568 ("[The manufacturer] may make the labeling change upon filing [a] supplemental application with the FDA; ***it need not wait for FDA approval.***") (emphasis supplied). (England Declaration, Doc. 209-1, pp. 28-31, ¶¶ 75, 86).

To demonstrate that it was "impossible" to strengthen a warning through a CBE, a drug manufacturer must demonstrate that (1) "it fully informed the FDA of the justifications for the warning required by state law" and (2) "the FDA, in turn, informed the drug manufacturer that the FDA would not approve changing the drug's label to include that warning." *Albrecht,* at 1678. There is <u>no</u> evidence in the record that the FDA would have rejected such a request. See *In re Avandi Marketing, Sales and Products Liab. Litig.*, 945 F.3d 749, 758-59 (3d Cir. 2019) (reversing summary judgment where brand name drug manufacturer failed to demonstrate that it fully informed the FDA or that the FDA made "a fully informed decision to reject the change"); *Duncan v. Allergan, Inc.*, 2020 WL 6204563, at *6 (C.D.Cal. 2020) (same). [12] Finally, Appellees' attempted reliance on label changes between 2007 and

---

[12] Appellees misstate the effect of certain articles, adverse event reports existing at the time of

2013 <u>actually</u> <u>proves</u> Appellant's point regarding CBE changes. Appellees were able to repeatedly change the label during this time period. The last unrelated label change has nothing to do with the CBE analysis here. The cases cited by Appellees at pp. 57-59 are factually inapplicable where, as here, there is substantial "newly acquired" evidence.

3.    <u>Appellant's allegations of "newly acquired information" are fully sufficient</u>.

"Newly acquired information" is defined broadly in the FDA regulations as follows:

> *Newly acquired information* means data, analyses, or other information not previously submitted to the agency [FDA], which may include (but are not limited to) data derived from new clinical studies, reports of adverse events, ***or new analyses of previously submitted data...***

21 C.F.R. § 314.3(b) (emphasis supplied); 73 Fed. Reg. 49609 (2008); *Wyeth* at 569.

As a federal court applying *Wyeth* and *Albrecht* explained:

> [E]ven if there was little or no "newly acquired information" relevant to Evans' claims, that did not make it *impossible* for Gilead to change its Truvada label. The FDA's CBE regulation permits a brand-name drug manufacturer, like Gilead, to file a supplemental application and

---

FDA approval, and the several unrelated changes FDA made to the original label. None of these factors establishes that the FDA carefully considered Proper Interval Testing (or even considered the issue at all). There is no "clear evidence" of such consideration. As in *Wyeth,* there is no evidence that the FDA gave more than "passing attention" to those articles, if that. Appellees never asked FDA to enhance the Lialda Label. As *Albrecht* and *Wyeth* and its progeny make clear, the mere approval by the FDA of the Lialda Label does not preempt Appellant's state law tort claims as a matter of law. *See, e.g., Brown v. Johnson & Johnson*, 64 F.Supp.3d 717, 720 (E D.Pa. 2014).

then immediately **"change a label to 'reflect newly acquired information' if the changes 'add or strengthen a ... warning' for which there is 'evidence of a causal association,' without prior approval from the FDA."** *See, e.g., Albrecht,* 139 S.Ct. at 1679 (quoting 21 C.F.R. § 314.70(c)(6)(iii)(A)); *Wyeth*, 555 U.S. at 568 ("[I]t may make the labeling change upon filing [a] supplemental application with the FDA; it need not wait for FDA approval.").

*Evans v. Gilead Sciences, Inc.,* 2020 WL 5189995, at \*10–11 (D.Hawaii 2020) (emphasis added).[13]

Appellant's FDA regulatory expert, England, thoroughly explains why substantial post-2007 approval information, including "safety signals," Adverse Event Reports, medical literature, and re-evaluation of existing information, constituted "newly acquired information" that would have supported a CBE supplement to add Proper Interval Testing. (Doc. 209-1, pp. 22-26, ¶¶52-72). Dr. Winston also explained the post-2007 "safety signals." (Doc. 210, p. 25, ¶ 38).

Appellees did submit the Declaration of Alan McEmber. (Doc. 182). But this included only an extensive list of medical articles which Defendants provided to the FDA as part of a massive submission. (Doc.182-2, pp. 7-29). This hardly satisfies the "impossibility" standard. There is no evidence that Appellees ever asked the FDA to consider the monitoring recommendations contained in World, Corrigan and other articles. There is no evidence that the FDA ever actually considered such

---

[13] Appellees weakly offers that the "long history of human experience with mesalamine-containing products and the FDA's knowledge of that history." [Response Brief; pp. 55-56]. That claim completely fails to meet the "impossibility" standard.

articles or refused a proposed label monitoring change.

4.    Proper Interval Testing Is a Label Safety Enhancement Contemplated by the CBE and Related Regulations.

Appellees erroneously claims that Proper Interval Testing somehow "does not fit the [CBE] criteria". (Response Brief; p. 60). As discussed, *infra,* a specific purpose of the CBE is to strengthen an instruction for use to enhance safety. There is <u>no</u> requirement of <u>prior</u> approval. 21 C.F.R. § 314.70(c)(6)(iii)(A), (C).

Second, § 201.57(c), the "Full Prescribing Information" section, *specifically requires* the inclusion in a manufacturer's label of all testing and monitoring information or instructions necessary to ensure the safe use of the drug.  *See generally* 21 C.F.R. § 201.57(c).

As noted, *supra*, the Safe Instruction Regulation requires the Warnings and Precautions section, where appropriate to include:

> *[T]he recommended frequency with which tests should be performed before, during, and after therapy*.[14]

(emphasis added).

Thus, Appellant's proposed Proper Interval Testing falls squarely with the FDA regulations regarding enhanced instructions for safe use.

---

[14] See fn. 2.

5.    <u>Appellees' "Highlights" argument has no merit</u>.

Appellees assert that a drug maker may not change the "Highlights" section of a prescription drug label without a prior approval supplement, or "PAS". (Response Brief; pp. 60-62). But Appellees' construction of the Highlights section requirement is contrary to *Wyeth* and *Albrecht* and unsupported by the totality of FDA regulations for at least three reasons.[15]

First, the Highlights section need not precisely mirror any changes made to the Full Prescribing Information ("FPI") pursuant to a CBE (which does not require such prior approval of a supplemental submission).[16] To argue otherwise, Appellees cite only to § 201.57(a). That section nowhere states that the Highlights section must mirror the FPI in a drug label. To the contrary, § 201.57 expressly indicates otherwise, as it requires the following (verbatim and mandatory) language to be included in every Highlights section, which scuttles Appellees' proposition:

> "These highlights do not include all the information needed to use (insert name of drug product) safely and effectively. See full prescribing information for (insert name of drug product."

---

[15] Appellees never asked the FDA to approve a change to the Highlights section.

[16] *See, e.g.,* FDA's February 2013 *Guidance for Industry: Labeling for Human Prescription Drug and Biological Products—Implementing the PLR Content and Format Requirements (the "FDA 2013 Labeling Guidelines"),*https://www.fda.gov/regulatory-information/search-fda-guidance-documents/labeling-human-prescription-drug-and-biological-products-implementing-plr-content-and-format ("The most clinically significant safety concerns should be presented in Highlights; however, not all of the safety information from the FPI [full prescribing information section] will always be included in Highlights."), at p. 13.

21 C.F.R. § 201.57(a)(1). Thus, Appellees' argument that the Highlights section must reflect the same information as the Full Prescribing Information section is facially unsound. In fact, there is a clear difference in the 2013 label in the Highlights and FPI language regarding monitoring of renal function.

Second, § 201.57 contemplates that certain changes to the Highlights section may be made without prior FDA approval. For instance, § 201.57(a)(5) requires the Highlights section to include recent major changes to the label "that have been approved by the FDA, *or authorized by §314.70(c)(6)* [the CBE regulation]". 21 C.F.R. § 201.57(a)(5) (emphasis supplied); *see also* FDA's February 2013 *Guidance for Industry: Labeling for Human Prescription Drug and Biological Products— Implementing the PLR Content and Format Requirements*, *supra,* n.16 at p. 8 ("When substantive labeling changes *have been made* to any of the following sections [including Warnings and Precautions] of the FPI *within the preceding 12 months*, the heading(s) of the changed section(s) must be listed in Highlights under the heading Recent Major Changes.") (emphasis supplied).

Thus, Appellees' construction of § 201.57(a) as effectively trumping CBE changes, is unreasonably cramped and wholly unsupportable. That construction would render the CBE regulation, § 314.70(c)(6), a nullity, and all CBE changes to drug labels prior to FDA approval impossible. Appellees cannot point to a single decision that supports such a construction of the labeling regulations, which would

effectively overrule *Wyeth* and *Albrecht*.[17]

Third, the FDA itself recognizes that appropriate changes to a label under the CBE regulations are not undercut by "the Highlights" regulation, and that such regulations should not be an impediment to CBE label modifications. 78 Fed. Reg. 67993 (Nov. 13, 2013).[18] Accordingly, the FDA says it "typically waives" prior approval requirements relating to changes in the introductory "Highlights" section of a label, where it is appropriate to modify the "Full Prescribing Information Contents" section of a label to enhance safety through a CBE. *Id.* Appellees never requested a waiver.

Finally, the Highlights section, established by the Physicians Labeling Rule ("PLR") and adopted by the FDA on January 24, 2006, became applicable to prescription drugs for which an NDA was pending as of June 30, 2006, such as Lialda, as of June 30, 2009. 21 C.F.R. §201.56(c)(2). Thus, the "Highlights" section

---

[17] Federal district courts, citing *Wyeth* and *Albrecht's* construction of the CBE regulation, consistently reject manufacturers' arguments that claims that they should have *strengthened* their labels are preempted due to impossibility. Defendants' Highlights argument is typically not raised as an issue in these cases (because it is meritless). *See, e.g., Mason v. SmithKline Beecham Corp.*, 596 F.3d 387, 396 (7th Cir. 2010); (reversing district court's grant of summary judgment where no clear evidence existed that FDA would have rejected the label change); *Montalbano v. Ariad Pharm., Inc.*, 2015 WL 11198245, at *8-9 (S.D.Fla.); *Baumgardner v. Wyeth Pharm.*, 2010 WL 3431671, at *2 (E.D. Pa.); *Dorsett v. Sandoz, Inc.*, 699 F.Supp.2d 1142, 1158 (C.D.Cal. 2010) (same).

[18] See also FDA discussion on proposed label changes at https://www.federalregister.gov/ documents/ 2013/11/13/2013-26799/supplemental-applications-proposing-labeling-changes-for-approved-drugs-and-biological-products.

regulation had no application to Lialda for several years.

      6.    <u>Appellees' Cited Cases Are Inapplicable.</u>

Appellees rely on two Supreme Court cases, discussing the inapposite standards applicable to <u>generic</u> drug manufacturers, not <u>brand</u> name manufacturers. (Response Brief; pp. 53-54), citing *PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011), and *Mutual Pharm. Co. v. Bartlett*, 133 S.Ct. 2466 (2013). Appellees fail to substantively discuss *Wyeth* or *Albrecht,* both of which govern the preemption defense in the context of brand drugs as contrasted with generic drugs. The fundamental distinction is that a generic manufacturer must use the previously approved label for the brand drug.[19]

Appellees go so far as to state, without citation to authority, that *Mensing* and *Bartlett* "apply equally to generic drugs and [brand name] drugs approved via an NDA." (Response Brief, p. 54). But the Supreme Court itself acknowledged in *Mensing* that "the federal statutes and regulations that apply to brand-name drug

---

[19] Generic drug manufacturers are subject to a "duty of sameness" standard under FDA regulations, which bears no relation to the duties imposed on brand name drug manufacturers seeking FDA approval through an NDA. *Albright v. Teva Pharmaceuticals USA, Inc.,* 290 F.Supp.3d 1321, 1327–28 (S.D.Fla., 2017);

*See also, e.g., Kaiser v. Johnson*, 947 F.3d 996, 1010 (7th Cir. 2020) (describing "crucial difference" between a brand name manufacturer's duty to strengthen a warning when needed, and a generic manufacturer's "duty of sameness"); *Wendell v. SmithKline Beecham*, 2018 WL 6267855, at *7 (N.D. Cal. 2018) (same); *Brazil v. Janssen Research and Dev., LLC,* 249 F.Supp.3d 1321, 1347-48 (N.D.Ga. 2016) (same).

manufacturers are meaningfully different than those that apply to generic drug manufacturers," which may "lead to different preemption results. *Mensing*, 564 U.S. at 626. Both *Mensing* and *Bartlett are* inapposite. Neither altered in any way the high *Wyeth/Albrecht* impossibility standard regarding CBE changes to brand drug labels.[20]

The remaining cases relied on by Appellees all involved undisputed evidence that the FDA rejected, or would have, rejected the proposed label change, or a complete absence of newly acquired evidence to warrant the CBE change.

### E.    The District Court Erred in Rejecting Appellant's Proposed Second Amended Complaint.

"One Chance" Standard: Appellant's Initial Brief has demonstrated that the District Court erred in denying Appellant's Motion to Alter or Amend and to file the proposed SAC under the "one chance" standard, recognized in this Circuit. (Initial Brief, pp. 37-39.) Appellant also there demonstrated that the District Court erred in denying his Motion for Reconsideration because his express warranty and fraud

---

[20] Indeed, *Mensing* clearly acknowledged this distinction. *Mensing,* 564 U.S. at 613, ("[B]rand name and generic drug manufacturers have different federal drug labeling duties").

This crucial distinction renders *Mutual Pharm Co., Inc. v. Bartlett*, 570 U.S. 472 (2013), similarly inapposite. The *Bartlett* case involved a design defect claim against another *generic* drug manufacturer,* not a brand name manufacturer. *Bartlett*, 570 U.S. at 472. Following *Mensing*, the Supreme Court simply held that the plaintiff's claims were preempted because "federal law prevents generic drug manufacturers from changing their labels.... Accordingly, [the defendant generic drug manufacturer] was prohibited from taking the remedial action required to avoid liability under [state] law." *Id*. at 473.

claims were not futile. (*Id.*, pp. 42-52).

First, Appellees' misunderstand this Court's application of *Bryant v. Dupree*, 252 F.3d 1161, 1164 (11ᵗʰ Cir. 2001). *Wagner v. Daewood Heavy Industrs. Amer. Corp.*, 314 F.3d 541 (11ᵗʰ Cir. 2002) did not overrule *Bryant*. (Response Brief; pp. 37; 64). Rather, *Wagner* overruled *Bank v. Pitt*, 928 F.2d 1108, 1112 (11ᵗʰ Cir. 2011), and, even then, only in part. Specifically, *Wagner* simply held that a district court is not required *sua sponte* to grant a counseled plaintiff a chance to amend if he did not request leave to amend before the district court. *Wagner*, 928 F.2d at 542.

For counseled plaintiffs who request leave to amend, such as Appellant, the *Bryant* "one chance" rule still applies. Indeed, the *Bryant* decision, after its modification by *Wagner* in 2002, has been cited repeatedly by this Court. *See, e.g., Higdon v. Tuson,* 746 Fed. Appx. 805, 815 (11ᵗʰ Cir. 2018); *White v. Cochran,* 2017 WL 6492004, at *2 (11ᵗʰ Cir. 2017).

All of Appellees' other cited cases on the "one chance" standard are also inapposite. For example, Appellees' footnoted attempt to distinguish *Nodd v. Integrated Airline Services, Inc.,* 41 F.Supp.3d 1355 (S.D.Ala. 2014), demonstrates the error in its position. The *Nodd* court explained that it is the *district court's determination of deficiencies* that, if unaddressed, constitutes a plaintiff's "at least one chance" to amend, not a defendant's motion to dismiss. *Nodd,* 41 Supp.3d at 1368-69.

Appellant's Breach of Warranty and Fraud Claims Are Not Futile: As to breach of warranty, Appellees do not cite even one authority disputing the cases relied upon by Appellant, which fully support such a claim. (Initial Brief, pp. 42-44).

Similarly, regarding fraud, Appellees cite only one case, *Stone v. Smith, Kline and French Labs*, 447 So.2d 1301 (Ala. 1984), which is facially inapplicable and has nothing to do with a failure to provide instructions for safe use.

Finally, Appellees suggest that Appellant cannot state a fraud claim because the "periodic" instruction for renal monitoring is couched as a "recommendation". The "Safe Instruction Regulation" uses the term "recommended frequency" for tests. However, such a recommendation, where appropriate, is mandatory under that Regulation and also under the AEMLD and applicable case law, discussed, *supra.*

The allegations in the proposed SAC misrepresentation regarding breach of warranty and fraud were fully sufficient to state a claim. See *Russell v. Ethicon, Inc.*, 2020 WL 4732106 (N.D. Ala.) (denying medical device maker's motion for summary judgment as to fraud and breach of warranty based on unsafe pelvis mesh instructions).

## IV.   <u>CONCLUSION</u>

Appellant Blackburn respectfully requests that this Court reverse the District

Court's Order at issue (Doc. 244) and remand this case for further proceedings.

## **CERTIFICATE OF COMPLIANCE**

Undersigned counsel certifies that this brief complies with the limitations set forth in Fed. R. App. P. 32(a)(7) and the type-volume limitation.  This brief contains 6429 words.


/s/Jonathan H. Waller
OF COUNSEL

Respectfully submitted,

*Jonathan H. Waller*
Jonathan H. Waller (WAL073)

**OF COUNSEL:**

Jonathan H. Waller
Waller Law Office, P.C.
2001 Park Place, Suite 900
Birmingham, AL 35203
jwaller@waller-law.com
(205) 313-7330

*Keith Jackson*
Keith Jackson (JAC067)

Keith Jackson
Riley & Jackson, P.C.
3530 Independence Drive
Birmingham, AL 35209
Telephone: (205) 879-5000
kj@rileyjacksonlaw.com

Attorneys for Plaintiff/Appellant Mark Blackburn

## **CERTIFICATE OF SERVICE**

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, I hereby certify that I have on this 19th day of January, 2021, served a copy of the foregoing documents electronically through the Court's CM/ECF system on all registered counsel and or via U.S. Mail.

/s/Jonathan H. Waller
Jonathan H. Waller